**Kenneth HARRISON**

v.

**FRED S. JAMES, P.A., INC. and Richard Peterson.**

**Civ. A. No. 82–2416.**

United States District Court, E.D. Pennsylvania.

Feb. 16, 1983.

---

**31.** Paper No. 113.

Frank P. Murphy, Norristown, Pa., for plaintiff.

Wilson M. Brown, III, Philadelphia, Pa., for defendants.

## OPINION

BECHTLE, District Judge.

This is a diversity action for wrongful discharge and breach of an oral contract for two years' employment. Presently before the Court is the motion of defendants Fred S. James, P.A., Inc. ("James") and Richard Peterson ("Peterson") for summary judgment. For the reasons that follow, the motion will be granted.[1]

### I. FACTS

Plaintiff is a former employee of defendant James, an insurance brokerage agency and consulting firm. Defendant Peterson is the executive vice-president of defendant James in charge of the Philadelphia office where plaintiff worked. The cause of action dates back to events occurring in 1980. At that time, plaintiff was employed as a manager in the marketing department of Alexander and Alexander, another insurance brokerage firm. In or about January

---

1. The appropriate standard against which a motion for summary judgment should be gauged was recently set out in *Federal Laboratories, Inc. v. Barringer Research Ltd.,* 696 F.2d 271 at 274–75 (3d Cir.1982). Here there is no genuine issue of material fact. Defendants' motion is based upon the pleadings, the uncontradicted deposition testimony of defendant Peterson, and the deposition testimony of plaintiff himself.

or February, 1980, plaintiff was contacted by an insurance search firm used by defendant James. Plaintiff was advised that James was looking for a marketing man and was extremely interested in him. Plaintiff agreed to meet with defendant Peterson of the James office. The meeting took place sometime in late February, early March, 1980. After a discussion of goals, objectives, and philosophies, Peterson asked plaintiff whether he was interested in a position with James. Plaintiff indicated that he was not interested in the positions offered. The meeting ended with Peterson stating that he would get back to plaintiff.

About a week later, the first of two luncheon meetings between plaintiff and Peterson took place. During these meetings, Peterson outlined a job as head of the marketing department at James. The job specifically included the responsibility of reorganizing the department. Plaintiff concedes that Peterson never promised him a definite term of employment at this or any other time. Nonetheless, plaintiff contends that "[h]e (Peterson) led me to believe I would be employed at least two years via this discussion." Harrison Dep. at 110. Plaintiff's belief was based on the following exchange. In response to plaintiff's inquiries into the time period he would be allowed to complete a departmental restructure and then "work out the bugs," Peterson replied that a year would be appropriate. Plaintiff then stated to Peterson that he would first need six months to become familiar with the department prior to attempting a reorganization. Peterson indicated that this time frame "seemed sensible."

The actual offer of employment was not made at the luncheon meetings. It was made over the telephone by the search firm. No mention was made on either side of a specific term of employment. A few days later, plaintiff met with Peterson. A salary of $52,500.00 was agreed upon as was a date, April 7, 1980, for plaintiff to begin working for James.

Although plaintiff testified that he did not recall the details of April 7, 1980, his first day at James, he believed he met with James' personnel manager, Mrs. Ward. At this time plaintiff executed various documents including a Memorandum of Agreement. This agreement covered compensation, confidentiality, non-competition, and termination. The document plainly states that it is "intended to set forth the terms and conditions of the employment relationship between James and its Employee." Harrison Dep. at 144–145; Exhibit D–6. Paragraph 11 is a termination clause which states that employment "may be terminated by either party upon fifteen (15) days prior written notice." *Id.* at Exhibit D–6 ¶ 11. Paragraph 10 stipulates that "this Agreement sets forth the entire agreement" between the parties, and "supercedes any and all prior agreements and understandings with respect of such employment."

That plaintiff reviewed the agreement prior to signing it is revealed by his questioning Mrs. Ward as to the document's necessity. Upon Mrs. Ward's confirmation of necessity, plaintiff executed the agreement without further objection or discussion.

During plaintiff's employment with James, by his own account his relationships with subordinates, account executives, and Peterson were good to very good. Plaintiff's termination during a meeting with Peterson on November 25, 1980, some seven months after he joined James, appears to have resulted from nebulous office "politics" and a loss of confidence in plaintiff by "other people." Harrison Dep. at 188–189. Plaintiff and Peterson discussed the details of the firing and it was agreed that plaintiff would be relieved of his responsibilities immediately, but would remain on the company payroll with full salary and benefits, including the use of company car, office space, and phone privileges, through March, 1981. This was to allow plaintiff time to find another job. Plaintiff voiced some concern over the announcement of his firing, but Peterson stated that "in the interests of the James organization," he had no choice but to immediately let others know that plaintiff had "resigned." *Id.* at 192.

Immediately after this meeting plaintiff returned to his office. There he found a message to call Harold O'Hanlon, a friend of plaintiff's who worked in the insurance industry in New York. When plaintiff returned the call, O'Hanlon reported that he had heard plaintiff was fired. Plaintiff claims this call indicates that other people in the insurance industry outside of James had advance notice of his firing.

As agreed, plaintiff continued to receive full salary and benefits until March 31, 1981. Plaintiff spent this time looking for another job, and did no work for James. Upon the completion of his severance from James, plaintiff received an additional five days' vacation pay and a profit sharing plan refund. At no time on or after November 25, 1980, the date of his firing, did plaintiff communicate to anyone at James that his termination breached his employment agreement.

II. DISCUSSION

A. Breach of an Express Oral Contract

Count I of plaintiff's complaint avers that defendant James, by firing plaintiff, breached an express oral contract for two years' employment. Plaintiff's claim is based exclusively upon his pre-employment lunch discussions with defendant Peterson. According to plaintiff, these discussions resulted in an oral contract between himself and James under which plaintiff was to be employed by James for at least two years.

In the face of the unambiguous terms of the subsequent written employment contract between the parties, signed by plaintiff April 7, 1980, plaintiff's claim is without legal force. Paragraph 11 of this agreement expressly indicates that the employment relationship between the parties is at-will, and "may be terminated by either party upon fifteen (15) days prior written notice...." Harrison Dep., Exhibit D–6. Further, paragraph 10 of the agreement

specifically states that the written agreement is an integrated one which "sets forth the entire agreement between the employee and James, and supercedes any and all prior agreements and understandings with respect of such employment." *Id.* In Pennsylvania the law is clear that when a written contract sets forth in plain and unambiguous terms the entire agreement between the parties, parole evidence of prior inconsistent negotiations, terms, or agreements may not be considered. "Unless fraud, accident or mistake [is] averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parole evidence." *Scott v. Bryn Mawr Arms,* 454 Pa. 304, 307, 312 A.2d 592, 594 (1973) (citations omitted). Further, when a writing contains an integration clause which expressly provides that the written instrument contains the entire agreement of the parties, it is conclusively presumed to do so, absent a showing that this clause was procured through fraud, accident, or mistake. *United States Gypsum Co. v. Schiavo Bros., Inc.,* 450 F.Supp. 1291, 1302 (E.D.Pa.1981).

Plaintiff makes several arguments in his brief in opposition in an effort to show fraudulent inducement, duress or mistake, and thereby avoid the parole evidence rule and cast doubt on the applicability of the written contract.[2] These arguments, however, are without merit.

Plaintiff first contends that Ward, defendant James' personnel employee, led him to believe that he was signing a non-competition agreement only, as a mere first day of employment formality. Plaintiff in effect is claiming deceit or fraud. Under Pennsylvania law fraud is shown by clear and convincing evidence of all of the following: (1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention that another person will thereby be induced to

---

**2.** The Court notes that plaintiff's complaint fails to allege fraud or mistake with respect to his execution of the written employment agreement. Although plaintiff has thus failed to comply with Fed.R.Civ.P. 9(b), the Court will allow the allegations in plaintiff's brief to suffice for purposes of the present motion. Defendants have filed a supplemental brief which addresses plaintiff's new arguments, and so the Court cannot say that defendants have been harmed.

act, or to refrain from acting; (4) justifiable reliance by the recipient; and (5) damage to the recipient. *United States Gypsum Co. v. Schiavo Bros., Inc.,* 450 F.Supp. 1291 (E.D.Pa.1978). The facts as adduced from plaintiff's own deposition indicate that a viable defense to the contract based on fraud does not exist.

■ There is nothing to suggest that Ward said or did anything even remotely approaching what could be called misrepresentation. Without a misrepresentation, the first element of a fraud, plaintiff's claim of fraud collapses. Moreover, even assuming the existence of the first three elements of a fraud claim, there is no evidence whatsoever upon which the Court could find the requisite justifiable reliance. In fact, the available evidence points the other way. Plaintiff, a college graduate, testified that he had over 10 years' experience in the insurance industry. Plaintiff further testified that he read the employment agreement, understood its binding nature, and asked whether it was necessary that he sign it. Harrison Dep. at 144–148. It is difficult to see how, under these facts, plaintiff can argue that he didn't understand either that which the agreement clearly set forth or its binding nature. *Cf. Yohe v. Yohe,* 466 Pa. 405, 353 A.2d 417 (1976) (If a party who can read will not read an agreement before him, he is guilty of the type of negligence which is not subject of protection, either in law or equity.). In the face of the present record the Court concludes that plaintiff cannot void the written employment contract by claiming fraud.

■ Plaintiff next argues that he signed the agreement because, having terminated his prior employment, he was not in a position to refuse. In effect, plaintiff's position is that he executed the contract under duress and therefore it is unenforceable against him. However, even viewing the circumstances in a light most favorable to plaintiff, the Court concludes as a matter of law that there has been no showing of duress. *See* Restatement (Second) of Contracts § 175 When Duress by Threat Makes a Contract Voidable (1979). It is not even suggested that there was any threat made to plaintiff by anyone associated with James. Then too, merely because one enters into an agreement which he would not enter if his financial circumstances were more secure, does not mean that a claim for duress exists as will void the contract. *Lawlor v. National Screen Service Corp.,* 211 F.2d 934 (3d Cir.1954), *rev'd on other grounds,* 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955). Aside from plaintiff's bare allegation, there is nothing in the present record which would support a finding that the employment contract was executed under duress. Plaintiff thus cannot avoid the written employment contract by such a claim.

■ Plaintiff also asserts that inclusion of the termination clause in the agreement was a mistake. There is no proof of such a mistake, however, except plaintiff's own contention that his intention was contrary to that expressed in the written contract.[3] Plaintiff seeks to introduce parole evidence of the prior negotiations to buttress his claim of mistake. Unfortunately for plaintiff, the parole evidence rule prohibits the Court from considering evidence of prior negotiations. Under the rule, any oral representations made during the negotiation stage are merged in and superceded by the written agreement. *Scott v. Bryn Mawr Arms, supra.* In order for evidence of the prior negotiations to be admissible,

---

**3.** The Court notes that under Pennsylvania law, a mistake of fact must be *mutual* in order to open the door to reformation or avoidance of the contract. *Central Transportation, Inc. v. Board of Assessment Appeals,* 490 Pa. 486, 494 n. 5, 417 A.2d 144, 148 n. 5 (1980). A unilateral mistake will not void a contract unless the other party knows or has reason to know of the mistake. *Hassler v. Mummert,* 364 A.2d 402, 242 Pa.Super. 536 (Pa.Super.1976). A denial by one of the parties to a contract that a mistake was made does not in itself prevent the court from finding a mutual mistake and reforming the agreement. *Central Transportation, Inc. v. Board of Assessment Appeals of Cambria County,* 417 A.2d 144, 490 Pa. 486 (1980).

plaintiff must *first* prove mistake. *Kattelman v. Sabol,* 425 Pa. 197, 228 A.2d 379 (1967). Plaintiff cannot use evidence barred by the parole evidence rule to prove the mistake necessary to allow admission of that evidence.

■ Plaintiff next claims that the employment agreement is unenforceable because there was no meeting of the minds on the terms of the written agreement. This argument is similar to plaintiff's mistake argument and is similarly unpersuasive. Again, the same parole evidence rule which plaintiff is seeking to avoid through his allegation of lack of intent to contract under the terms of the written agreement, bars consideration of testimony regarding the parties' intent prior to the time when the contract was executed. *Kawecki Berylco Industries, Inc. v. Fansteel,* 512 F.Supp. 984, 986 (E.D.Pa.1981), *order stayed in part* 517 F.Supp. 539. Plaintiff is thus bound by the objective manifestation of his intent as plainly expressed in the written contract he executed.

■ Plaintiff's final argument, that the written agreement is unenforceable because it modified the parties' oral agreement without consideration, must be rejected. Since plaintiff has not proved the existence of a prior oral agreement, the written agreement cannot be deemed a modification. The lunch discussions upon which plaintiff bases his claim of an oral contract cannot be used to support plaintiff's position because of the parole evidence rule.

In sum, plaintiff cannot avoid the written employment agreement that he executed. There is no basis on the undisputed facts in the record upon which the Court could find fraud, duress, or mistake. The parole evidence rule thus preempts consideration of the negotiations plaintiff claims constitute an express oral contract. As discussed above, plaintiff's lack of consideration theory is without merit. Summary judgment on Count I shall therefore be entered in defendants' favor.

**B. Wrongful Discharge**

■ Count II of plaintiff's complaint avers that his termination amounted to a "wrongful discharge" under Pennsylvania law. For purposes of this claim plaintiff concedes, as he must, that he was an "at-will" employee, that is, one not hired for a specified term of employment. Pennsylvania law only recognizes actions for wrongful discharge when the employment relationship is at-will. *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974). This is apparently because terminated employees who are not at-will employees can pursue their claims under breach of contract theories.

■ The general rule regarding at-will employees is that absent a statutory or contractual provision to the contrary, the relationship may be terminated by either party at any time, for any reason, or for no reason. *Bruffett v. Warner Communications,* 692 F.2d 910 (3d Cir.1982); *Beidler v. W.R. Grace, Inc.,* 461 F.Supp. 1013, 1014 (E.D.Pa.1978), *aff'd mem.,* 609 F.2d 500 (3d Cir.1979); *Cummings v. Kelling Nut Co.,* 368 Pa. 448, 84 A.2d 323 (1951). In the interest of public policy, Pennsylvania has carved out a narrow exception to this general rule. In *Geary v. United States Steel Corp., supra,* the Supreme Court of Pennsylvania acknowledged that an employer could not discharge an at-will employee if the discharge would violate a "clear mandate of public policy." *Id.* at 184, 185, 319 A.2d at 180.

The *Geary* court declined to define the perimeters of such a public policy exception. Nonetheless, subsequent decisions have interpreted *Geary* to allow an employee a cause of action for wrongful discharge when important and well recognized facets of public policy are at stake and there is no available statutory remedy. *E.g. Perks v. Firestone Tire & Rubber Co.,* 611 F.2d 1363 (3d Cir.1979) (employee discharge for refusal to take polygraph); *Hunter v. Port Authority of Allegheny County,* 277 Pa.Super. 4, 419 A.2d 631 (Pa.Super.1980) (employee refused job because of a 13 year-old misdemeanor conviction for which employee had

been pardoned); *Reuther v. Fowler & Williams, Inc.,* 255 Pa.Super. 28, 386 A.2d 119 (Pa.Super.1978) (employee discharged for serving jury duty); *Jurewicz v. Master,* 4 Phila.Co. 622 (1980) (employee discharged for testifying at criminal trial). *Compare Rogers v. IBM Corp.,* 500 F.Supp. 867 (W.D. Pa.1980) (employee discharged because of relationship with subordinate employee—public policy not transgressed, no cause of action for wrongful discharge); *Beidler v. W.R. Grace, Inc., supra,* 461 F.Supp. 1013 (employee discharged after company failed to follow its own evaluation policies—no public policy violation, no cause of action for wrongful discharge); *Yaindl v. Ingersoll-Rand Co.,* 422 A.2d 611 (Pa.Super.1980) (employee discharged after criticizing safety of employer's product—public policy not threatened, no cause of action for wrongful discharge).

 In the present case plaintiff claims that defendants offended public policy by actively recruiting and then firing him, without giving him an opportunity to seek other employment. Although plaintiff has not expressly identified a specific aspect of public policy violated by defendants, the Court reads plaintiff's complaint as charging that defendants specifically intended to harm him by their actions. Allegations of specific intent to harm may support a claim for wrongful discharge. *See Boresen v. Rohm & Haas, Inc.,* 526 F.Supp. 1230 (E.D. Pa.1981). Plaintiff thus makes out a cognizable claim under this theory.

Having successfully alleged a cause of action, plaintiff is nonetheless unable to support it in the face of the present record. Even a liberal reading of the facts shows that there is no substance to plaintiff's allegation that he was discharged as a result of a specific intent to harm. Although plaintiff's discharge was unexpected, plaintiff was given a most generous opportunity to find another job. Plaintiff received over four months' notice and enjoyed full salary and benefits from defendant James following the conclusion of his job responsibilities. Additionally, defendants offered to provide potential employers with a good reference on plaintiff's behalf. These facts weigh in defendants' favor and preclude plaintiff from claiming specific intent to harm on the part of defendants. That word of plaintiff's discharge was on the street prior to his actual termination is, at best, only arguably unfair. As stated by the court in *Boresen v. Rohm & Haas, Inc., supra,* 526 F.Supp. at 1236, "arguably unfair conduct on the part of [the employer is] an insufficient showing under Pennsylvania law."

In short, plaintiff has failed to show that an important aspect of public policy was violated by his discharge. Plaintiff thus cannot recover under a wrongful discharge theory, and summary judgment on Count II of the complaint shall be entered in defendants' favor.

An appropriate Order will be entered.